Our third case of this morning, American Orthopedic and Sports Medicine v. Independence Blue Cross Blue Shield, at aisle number 17-1663. Mr. Saltman, Mr. ... how do I pronounce that? Hold that one, Your Honor. Hold that one, okay. Thank you. And Ms. ... Whenever you're ready. Thank you, Your Honor. Good morning, and may it please the Court. First, I'd like to reserve six minutes for rebuttal time, if I may. That's fine. Thank you. Your Honors, what this case is really about is that insurance companies want to be able to underpay out-of-poor claims and get away with it. How long has this been, these anti-assignment provisions, been in these policies? I had no idea that this existed, and I was very curious that a lot of states have mandated that assignments have to be recognized. When did this all happen? Do you know? I honestly do not know. I apologize. I wish I did. But you've been representing a lot of these? Only for about a couple of years. Okay. Since I've been representing them, I've seen quite a few of them. They probably show up in about a third of our contracts that we look at. But the circuit courts that have addressed this go back to the early 90s, right? Yes, I think the Vitowitz, which is a case out of the Ninth Circuit, was in 1991, if I'm not mistaken. So what do we do with the fact that there was congressional silence? There's been this very significant development in the lay of the land with the emergence of these anti-assignment clauses. Congress has taken no action. How can we take from that a prohibition in the terms of ERISA for administrators to freely negotiate this term in exchange for other benefits that they may be able to get for their beneficiaries? Well, we don't need to take that as a prohibition. We're not asking for a prohibition of all anti-assignment clauses. We're simply asking for an exception to what otherwise would be a valid clause in the contract with respect to providers only. And the reason for it is because when it comes to other people, third-party creditors, strangers to the contract who have no actual value, no purpose being there in the first place, anti-assignment clauses make sense. When it comes to the providers of the very services, the contracts exist to reimburse. They make no sense. But this very clause says anti-assignment providers, so it really is very specific. And even though it doesn't make sense, isn't it freely contracted for? Well, it's freely contracted for between parties that are not the patient. And the patient is the ultimate purpose of ERISA is to protect the interests of the patients. Their interest is above all else. Well, it would be one thing if the negotiation were between the patient and the insurance company, and then maybe say it's a contract of adhesion. But it isn't. It's negotiated between the group, the entity, and the insurance company in presumably equal bargaining position. And if the one side abandons the patient in return for something else that the insurance company is going to do, what can a court do? A court can do what Congress intended it to do, which is to fill in the gaps of ERISA. Well, but in the pension area, they said there can't be alienation or assignment. But they didn't say that in the area of welfare benefit plans. That's correct. And the general rule of law in our country is that assignments are favored. In fact, the free market argument is really on our side. The free market wants people to be able to freely assign their property. When there's a departure from that, as there was in the pension side, there have to be good policy reasons for it. And generally speaking, if we favor assignments and two parties that are not the parties that actually are affected by the term negotiate an anti-assignment, a prohibition of what normally is considered a favorable thing, assignments, that should be looked at with the utmost scrutiny. And that's what we're asking this court to do. You're asking us to carve out an exception. Our limited role here is looking to what Congress has provided in the terms of ERISA as to the powers of the administrator to negotiate. And you're asking us to read into that, not merely that because this was against the backdrop of assignments being allowed, that they are absolutely allowed and that's how they should be read, but that we should be reading in a general provision plus an exception. None of this is stated in the terms of the statute. How can the federal judiciary do that when that's not in what Congress put into the statute? Well, Congress, I think it was Firestone, and I think this court quoted Firestone in North Jersey Brain and Spine, and it said that this court can fill in the gaps of ERISA. So when I see what you call silence with respect to assignments, I call a gap that this court can fill in to protect the interest of the patient. So I'm just thinking I'm lost in the logic here. If regulators have said you cannot have anti-assignment provisions in pension plans, so you cannot have X, and then with regard to health care plans, it's silent, the only way to read it is you can have X. Nothing prohibits you from doing that. And you've got six circuits that say exactly what that logic leads to. Why should we create a circuit split? Well, I don't think the logic actually leads to what the other circuits say. I think that's what the liturgo says, that's what the first circuit says, that's what the second circuit says. So why are they all wrong and logically you are right? They're wrong because they do not recognize exactly what this court recognized in North Jersey Brain and Spine, which is that assignments benefit the interest of patients by increasing their access to health care and provide a meaningful avenue for meaningful judicial review. Otherwise, what we're doing is we are basically incentivizing or at least allowing insurance companies to underpay claims and have no meaningful judicial review. You can flip that around to the other side big time and say, if we allow what you want us to allow, that health care costs will rise exponentially. I'm sorry, can you repeat that question? In other words, if we rule in your favor against the other circuits, health care costs will rise exponentially. I don't know. I've never seen anything that suggests that that's the case. I know it's repeated often. I don't necessarily subscribe to that. But every case has been decided and also this case, there is much more charged than what is paid, right? I believe so, yes. Okay, so isn't the consequence that some may fear here is that if we don't allow anti-assignment provisions, that there's going to be a significant increase in health care costs? Well, that is a consideration, Your Honor. What I think really cuts through this is that while the insurance companies claim to care about networks and think that that is the best way to achieve cost containment, they offer out of network coverage. And then they want to be able to evade any sort of responsibility when the party that is in the best position to challenge their reimbursement wants to file suit. Let's talk about the alternative, the limited power of attorney, because the document that was provided here seems to – purports to be both. Although I take it from your request for remand, you agree that the limited power of attorney does not comport with the state law requirements. I think that the technical requirements are not there. Correct. What about more generally? Is a limited power of attorney, as your learned colleague has suggested, merely a species of assignment? I'd say they're related. They have similar, perhaps, backgrounds, but I think they serve two functionally different purposes. The assignment allows the assignee to step into the shoes of the assignor, whereas the power of attorney allows the grantee to simply file suit on behalf of and in the name of the grantor. And I think there are certain differences between those two, and an anti-assignment clause has to be strictly construed against the drafter, and if it specifically states one, it doesn't state the other, then it simply does not encompass the other. Would it be in the power of an administrator under ERISA to prohibit an insured from issuing a limited power of attorney? For example, if a military spouse is overseas or someone is concerned about their competence post-medical procedure? Would it be in the plan administrator's power to do so, to limit, to prohibit that? To prohibit an individual insured from granting a limited power of attorney to another individual to handle their affairs. I haven't thought about that, but I would say yes, but that simply is not the case that we have here. No, what we're thinking about is the next case. Fair enough, I understand. That's why we ask hypotheticals. I understand. The consequences of what we're doing here. So what do you think would be in that circumstance? I think that would be allowed. I do see that, but that, I think, does not affect the core argument here, which is that the right policy is to allow providers to sue when they have a dispute over reimbursement of their service. That being allowed, being that an insured has an inalienable right to grant a limited power of attorney if they're concerned about their competence or they're going to be inaccessible? Or are you saying that what you think is allowed is that an OASA administrator could prevent an insured from granting a limited power of attorney to protect their affairs in that circumstance? I think, Your Honor, honestly, I think that that is, if I had to weigh the equities, I would say that it probably should not be allowed for a plan administrator to do that. Now that I've thought about it for a second, I think that it does not make sense, especially where the interest of the patient is to be put above all other interests, all other considerations. I think in this case, both an anti-assignment clause and a prohibition of a power of attorney do not best protect the patient's interests. Has Congress been lobbied on this issue, do you know? I do not know that. I do know that they have, through Department of Labor regulations, it's tangentially related that they have expressed concern with or at least tried to prohibit any sort of limitation on, I believe it's the, just give me one second to look. Or maybe it's more a matter for the state laws because a number of the states have taken it up. Well, I think most state laws on this issue are preempted by ERISA, and I think that, in fact, in Mackie we had exactly that, a state law that specifically related to ERISA punishments was struck down as preempted. So I don't think the state law would, in fact, provide the avenue here for this. All right. Thank you. Thank you. Mr. Becker, McDonald. Mr. Holzapfel. Good morning, Your Honors. May it please the Court, Michael Holzapfel, I'm a partner with the law firm Becker, LLC, and I represent the appellee Horizon Blue Cross Blue Shield of New Jersey. Mr. Holzapfel, I don't understand the argument that health care costs would go up. If the patient assigns the right to the provider and the provider sues, the provider's rights to reimbursement would be no greater than the patient's. So if the charge, the out-of-network charge under the policy, was appropriately assessed and paid to the patient, then the out-of-network provider who's suing is not going to get any more than that, are they? Well, yes, in this context and in the context of out-of-network cases similar to these, which have really proliferated in recent years, because in this particular context, we're not dealing with the situation in which the out-of-network provider is seeking to obtain the payment that is prescribed by the plan. This particular plan, this IBC plan, it paid the claim. There's been no dispute that it paid the plan-prescribed amount. But then doesn't the provider have to be saying that what it paid to the patient wasn't the correct payment? There's been no allegation of that in this case. There have been constant references to underpayments, but there has been nothing in the record, nothing proffered that these Medicare-prescribed, Medicare-based fee schedules, upon which out-of-network benefits are calculated, did not pay appropriately. The allowance for this particular claim was about $4,000. The plaintiff is suing, or American Orthopedics is suing for $58,000. But if the proper charge, as between the insurance company and the patient, was the $4,000, the provider is not going to get any more on that, more than that, on suit, are they? Well, it shouldn't if we litigate this on the merits, but that is certainly the nature of this complaint. It's the nature of most out-of-network provider lawsuits that are filed these days. But it's the nature of an assignment. They don't have a right to anything more than the assignor. The assignor is party to a plan that provides for certain fixed fees for the out-of-network service. So can you address Judge Riddell's question? Assigning rights can't rise any higher than the assignor. That's 100% correct. That's 100% correct. Are you saying you're forced to settle them just because they bring these suits, and you're forced to settle them? Well, that is certainly one component. Because they have muscle, and the individual patient couldn't fight this suit, but the provider could? Certainly. Well, in that whole context, then the assignment of benefits, or in this case the assignment of a right to pursue a claim for benefits, is a nullity. Because under ERISA, there is no claim for benefit. The plan paid what it was prescribed to pay subject to appropriate cost sharing. But if everyone agreed on that, it would be irrational for someone to bring suit because they're incurring litigation costs too. So presumably, whether it is the insured or the provider, they're bringing suit because they think the payment was not made as prescribed for the out-of-network service. I mean, isn't the upshot of this that the Anti-Assignment Clause isn't – it's not changing the costs, but it is changing the collectability of them. It's preventing providers from collecting because the insured, who now can't assign the claim, does not have their own motivation or wherewithal, in many cases, to enforce the payment for the out-of-network service. Well, what – sorry to answer the question with another question, Your Honor, but what exactly is it that the insured is looking to enforce when the plan pays the prescribed rate? It's in the contract – it's in every insurance contract that when an insured chooses to go out-of-network and when an out-of-network provider chooses to treat someone who is insured by a carrier with whom he knows he does not participate, there are substantial cost-sharing obligations that go along with that, and the out-of-network provider is allowed to balance bill. But the rate – the plan-prescribed rate is still the plan-prescribed rate. But isn't there some gray area as to actually what was done and what was involved? In other words, the plan says, well, you had A and B, and this is just a clean shoulder whatever. And the person says, no, this was a laceration, and, you know, you put in code 506 instead of 508, and it ends up that really you were supposed to pay me $12,000. Isn't – doesn't that happen? I'm sorry, counsel, you're shaking your head no. Maybe you can explain when you get up. Could you answer that question? The answer is, Your Honor, the answer is no. Specifically with respect to this case, there's been no allegation in the complaint or in the administrative record or any of the proceedings below that this claim did not price and pay appropriately subject to the terms and conditions of the plan. And most fee schedules, out-of-network fee schedules by health insurance carriers derive from some sort of metric. The modern advent has been to have those fee schedules derive from multiples of Medicare in certain cases. And Medicare is the world's largest insurer. It has a very comprehensive system with the RBRVS, and there's a prescribed rate for virtually every CPT code. Might there be a CPT code for which Medicare does not prescribe a rate? Perhaps, which is why most policies say in the event of an unprescribed CPT code, which we're not dealing with here, we're dealing with a garden-variety shoulder arthroscope. That could be a charge-based allowance, but it's – I've been doing many of these. It's extremely rare, Your Honor. Why shouldn't we remand in view of the limited power of attorney here? Perhaps not perfected in its terms, but how could even an anti-assignment clause bar an individual insured from granting a limited power of attorney to someone else to handle their affairs? How could that be? My light has gone off. You're out of our time. For a few reasons, Your Honor. One, because I think the court's inquiry is – first of all, it's premised on something which I just heard a concession from counsel on. It's not true. We're not dealing with the power of attorney here. But we're asking if you have a power of attorney, can that be barred? No, the power of attorney, I would posit, derives from the underlying right. The power of attorney to act on behalf of a principal vis-a-vis a substantive right, you have to first look at the right itself. And here, that right is non-transferable. And as we said in our supplemental brief that was created by the court – and I'm sorry if this sounds overly simplistic, but as they say sometimes, common sense makes for the best law – one should not be able to accomplish indirectly by taking, for what is all intents and purposes, substantively and procedurally identical language, and then accomplish what one cannot – what is specifically prohibited from accomplishing directly. Is it really your position that, for example, a military spouse who has the military member overseas for a year and so has been granted a power of attorney to handle affairs for that military member, can't bring suit, if necessary, to collect on insurance payments that are not being made for services that have been previously provided? I would submit that that is a different set of circumstances from what we're dealing with here. As Your Honor mentioned before, there's that particular scenario. There's a scenario in which somebody might be incompetent. But either it's the individual's power to grant it or not, or it's something that is within the power of an ERISA administrator to prevent. And I hear you saying that actually this is something that can be – this is an individual's right that can be negotiated away by an ERISA administrator. How can that be, given any one of these examples? I mean, take the military one. How could that be? Sure. In that particular context, if there had been a – remember, let me back into it this way. ERISA 502.29 U.S.C. 1132 provides for a right of action to a planned participant or a beneficiary to clarify rights under a plan, to clarify terms and conditions of a plan in the event that there has been a denial, reduction, or termination of benefits. In situations where that arises and the actual named participant or beneficiary might be overseas, might be incompetent, I would agree that a power of attorney could allow that person to act for the benefit of that principal on a bona fide ERISA claim. But what we have here and what we have in virtually every other out-of-network provider lawsuit is not a provider acting as an agent for the benefit of a principal. We have a provider suing in his own name for his own benefit, not for the benefit of the principal giving the power of attorney, seeking something that is just not prescribed by the plan. If done properly, that is, if the power of attorney were granted so that a provider or the provider's collection agency were designated to bring suit in the name of the insured, under that circumstance, you would agree that that would be a viable option. I would say, as I said in my supplemental brief, that in that particular context, where they are acting for their own benefit unrelated to, or not necessarily related to, a particular denial of a claim under a policy, then all you're doing is taking the power of attorney, calling it an assignment of benefits, saying, here's my ERISA beneficiary status. And I think the analysis is a little bit inconsistent with what this court ruled just two years ago in Newark-Jersey Brain and Spine. What I take from Newark-Jersey Brain and Spine, remember, before this court resolved that particular case, there was a stark disagreement at the district level in New Jersey. There was a wide split of authority as to whether or not a directive of the right to payment necessarily transfers ERISA beneficiary status for purposes of prosecuting a 502 claim as a beneficiary by assignment. This court said, no, a directive of a right to payment is a right to sue on the claim for the benefit denied. But we weren't dealing with it with an express anti-assignment clause or an express power of attorney. And here we have something that purports to be a power of attorney. I understand you've said there's problems with it, but they've asked for a remand to address those problems. I'd like to understand your position as to when, if ever, a power of attorney would be effective, because I'm not sure who would be the one, if there's some circumstances, like a military member, or if there's concerns about competence, for example, where someone would say, oh, that's a good reason. You seem to be saying, well, if it's for the provider to collect on the claim, that's a bad reason. But what if someone doesn't have dependents or doesn't have someone else to act on their behalf and doesn't want to be in the business of trying to collect from their insurance company? So they opt to grant a technically correct power of attorney to the provider so that that's not something that they need to concern themselves with. Why can't they do that if a power of attorney is something that, in fact, can be granted and is inalienable to be insured? Well, as I mentioned, Your Honor, and not to belabor the point, as we pose hypotheticals and address things in that particular context, which is what a power of attorney is supposed to serve, where there is a bona fide claim and the inability or unwillingness to act on one's own behalf, could a specialized power of attorney that conforms with state law direct the attorney, in fact, to act for the benefit of the principal? Perhaps, yes. I would say yes. But here, when we're dealing with an assignment of a right to pursue a claim, to pursue an action that really is not related to any particular planned benefit, it's simply a claim that we should have been paid for for this particular service, I think that's something else entirely when one is asserting derivative beneficiary status under ERISA, as this provider and most of the providers do. Well, if there is a grant of power of attorney, then it can be for any number of claims on behalf of that individual. If that is something that is viable, why shouldn't we, as requested, remand for the power of attorney here to be amended and properly handled going forward in the district court? Because, again, I would have to pose this question to American Orthopedic. A power of attorney to act for the benefit of what claim? What claim exactly? If there's an injury there that this policy did not pay an available benefit... That's litigation on the merits as opposed to who can be in court to litigate those merits. Well, the power of attorney has to be specific. I mean, it has to be specific to a certain chose, a certain claim, a claim related to my claim for underpayment of benefits for this data service based on policy provision X. That's not what we have here. That's not what the power of attorney is set up to be, and there's never been any claim that there is. Here we have an out-of-network provider who is dissatisfied with a fee schedule prescribed by a plan. That's not a power of attorney over a specific claim. That is, insurance companies should have different out-of-network fee schedules. That's something else entirely, and that's not what this is. So, if I understand you correctly, that if Smith is out of the country in the military, Smith's spouse, under a power of attorney, can act in place of Smith? In my experience, I would say yes. In my experience, most plans actually do have limited circumstances where one can act for the benefit of another. It happens in situations of incapacity. It happens in instances where the plan itself, suppose there's a coordination of benefits issue or a subrogation claim where the plan itself can assert the rights of the member against the other carrier in a coordination of benefits context. That is allowed. It can be and is allowed. But when we're talking about, here's my ERISA beneficiary status out-of-network provider. Go try to get some more money from the insurance company. That's what this case is. That's what all these cases are, and I would submit that that is something different entirely. One final question before we sit down and we get Ms. Tanyoski up. If there's an anti-assignment provision in the underlying plan documents, why does the health insurance claim form contain a box for assignments? Well, the health insurance claim form is something that's created not by the specific carrier, but it's created by the American Medical Association. Okay. And there are most plans. Remember, there is still a distinction between, as evidenced by every other circuit court who has addressed this issue, there is a distinction between paying a claim directly to a provider who gives a service and prescribing a provider right of administrative appeals and a wholesale transfer of one's ERISA beneficiary status under Rule 502, which is why we have cases like Cohen and why we had cases like Advanced Orthopedics, wherein the court noted that this is common for plans to do, to pay claims directly, but participation in a routine claims administration and adjudication process is a lot different from asserting ERISA beneficiary status, bringing in action in federal court, saying you violated federal law by not doing this. That is a right that is personal to the member. Thank you. Thank you. Okay. Ms. Danielski. You're going to tell us about congressional intent, right? Good morning, Your Honor. Susan Danielski on behalf of Independence Blue Cross, and with me is Ms. Gallagher, who is the Associate General Counsel of Independence. I'm going to start by telling you it's bad public policy to take rights that Congress granted to members and participants and their beneficiaries and transfer them to doctors. But if the member and beneficiary wants to do that, why shouldn't it be up to them? I mean, that's the whole point is that the individual patients want to do this. Why should they not be allowed to? Because their employers have negotiated not to do it. And, again, in most instances, the cost savings here is that if you choose a network provider, everyone saves. That's good public policy. The member pays less. The member in this instance. That may be good public policy, but if an individual wants to go out of network because the network providers just aren't going to, they don't think they're going to get the service that they want and go out of network and realize they're not going to be reimbursed that much, that's fine. But why should we bar assignment of rights? But it was paid, as Mr. Holzhoffel said, they were paid here. They were paid the amount. And that's the answer to the provider. When the provider comes calling and says, I have an assignment of rights, and then you say, well, too bad. This is the amount that's paid. There are hundreds of these cases. And are you paying money on them? In 99.9% of them, the claim has been paid at the appropriate rate, but it's the out-of-network providers who say, we don't like your reimbursement rates. But the court is going to say, well, that's really too bad. But we can cut that off. Again, that's why the anti-assignment provision here should be approved because it keeps strangers to the contracts. It keeps the insurance companies from having to fight this fight, right? Well, I don't know about you, Your Honor, but I don't work for free. I don't think Mr. Holzhoffel does. None of us do. And when you have administrative costs that are increased. We're close, but that's okay. Free is a relative term. But when you have administrative costs, if every out-of-network claim results in a lawsuit because the out-of-network provider wants more, that's an astronomical cost. And not only that. But what if you're, I mean, there might be instances where you are improperly denying claims or paying less than should be paid, and the individual patient isn't going to have the wherewithal to pursue that claim. Those are rare. The cases where that happens are investigational or experimental treatments because millions of claims get paid every day. It isn't like, Your Honor, you and I are about the same age. It isn't like when we were young and we thought about insurance adjusters, they would look at the claims, they would approve them. I used to look at them when I was a kid. They're not taking judicial notice. Put their stamp on them. Everything today is electronic. If you're a doctor in the network and you submit a claim, a clean claim, let's say you go for a mammogram, okay? It's a CPT code. It goes in there, gets paid. The doctor probably submits it in a couple of days. Three days later, it gets paid. It's all electronic. When you start injecting people and lawsuits into this process, it starts costing a lot of money, and it costs a member more. The member here had a $2,000 deductible. I don't know if the provider collected it. But those costs and policies seem like the business of legislators. We're looking at a statute. I take your argument to be that because there's a prohibition on assignment in the pension context, that we should infer that from that, that Congress intended to leave it to the negotiations of plan administrators how assignment would be handled in the welfare context. But the purposes of the statute are to protect and provide benefits to the beneficiaries. So an anti-assignment clause protecting the pensioner, the pension beneficiary, makes sense, right? In the context of a welfare plan where it's the preference and interest of the insured to assign their claim, why would it serve the purposes of the statute to allow an anti-assignment claim going to the purpose of the statute, but also as to the language of the statute, why wouldn't we infer the opposite? Why isn't the more natural reading that having prohibited assignment in one context, Congress was assuming that the status quo of rampant assignments to providers, the way the medical industry was functioning and to some extent still functions, that that was the way things would proceed in the welfare context? Why doesn't it, by the text and by the purpose, indicate that anti-assignment clauses are not permitted under welfare plans? Well, for the very same reason that if you want to prohibit something, you generally have to say so. I don't think by saying if you prohibit them in the pension context and the purpose of the statute is to protect pensioners, is to protect employee benefits, that you should also, that you should allow them in the welfare context because it's easier. You can't make that assumption. The other thing is, in 1974 when ERISA was enacted, the predominant types of plans were indemnity plans or fee for service. They were referred to, there were generally two parts, hospitalization and major medical. Indemnity plans are not available any longer. They're all managed care, either health maintenance organizations or preferred provider organizations, which is, this was a PPO. Patients benefit tremendously by having robust provider networks where the most providers join the networks.  The provider gets direct payment and speedy direct payment from the insurance company, and the insurance company saves the administrative costs of administering all these out-of-network claims where they can be paid pursuant to the benchmark, but if every one of them or a great majority of them are going to be followed by lawsuits, it's been over 40 years since Congress enacted ERISA, and yes, we had different kinds of plans in 1974 than we do now, but in 2010, Congress did a significant overhaul of our health care system in the Affordable Care Act. If this was a problem, you would have expected to find something about it in the Affordable Care Act, and there is nothing. As a matter of fact, the Centers for Medicare and Medicaid Services, you may sometimes see the acronym CMS in relation to Medicare, every year they approve one insurance company's policy or plan for use on the exchange. The most recent one that was approved was that of Independence, and it includes the anti-assignment provision. So the regulatory folks have certainly approved the anti-assignment provision and haven't found it problematic, and frankly there is no other way to describe these cases as a money grab. Were anti-assignment clauses, if you know, were they raised in any of the committee hearings or alternative bills or amendments proposed? Probably in the Affordable Health Care Act. That I do not know, but there is nothing in the Act about networks, and there is a lot in the Act about the benefits that have to be provided, and if this was a problem, you certainly would have expected to have found it in the ACA, and it's certainly not there. This is simply a money grab, because it's never, you didn't pay, you didn't pay us the amount we wanted. The provider here charged over $58,000 for a claim that was paid at approximately $2,600, which was 50% of the Medicare rate. That's the benchmark, and the insurers use Medicare as a benchmark because it's reliable, everyone uses it, everyone understands it. You asked us to look at the sort of larger picture, longer-term benefits that might accrue to the insurers, to beneficiaries in their costs if everyone comes in network. But more immediately, with anti-assignment clauses, isn't the effect that providers will not provide services to folks who can't just simply pay up front and don't have the wherewithal to do that, and why doesn't that bring us back into the realm of something akin to an escape clause like we addressed in the Northeast Department? That's up to every provider. Every doctor has the ability to decide whether they want to accept Medicaid, Medicare, Cigna, Aetna, Independence, Blue Cross, or any of the plans. They all make those decisions. If providers decide not to take insurance, that's up to them, and they must know that in order to get paid, they have to get the money from somewhere. But this isn't about getting paid. This isn't about how much you're getting paid. These cases are never about that. There's a cap across the board on the out-of-network fees. This seems on its face to be about collection, not about the amount that is either covered under the terms of policy or it's not. And this goes really to collection, doesn't it, the ability of the provider to collect or whether the provider has to rely on the patient to go and collect on behalf of the provider. Well, for example, this was a Pennsylvania plan, so the member was paid. In New Jersey, there's a statute that requires out-of-network providers to be paid directly because they have good lobbyists. So if it was a New Jersey plan, the out-of-network provider would have been paid directly, and because it's one of the regulations of insurance, so it's not preempted by ERISA. But this was a Pennsylvania plan, and so the member was paid directly. And plus, the member had a deductible. Now, that's up to every individual. But the broader picture is more important because the costs involved in having to litigate every suit because providers don't like, they're essentially saying, employer, we don't like the benefits you gave this person or insured. What right does a provider have to dictate to the employer what benefits the employer will provide? The employer could have provided no out-of-network benefits, and some employers, to save money, don't include out-of-network benefits. That's the policy. I got it. It's a huge drain on the system. Anything else? No, thanks. Thank you very much. Lawrence, essentially what I hear my opponent saying is, just trust us. Trust that we properly pay claims, correct, every single time. There's no reason to ever make it. If there's a lack of trust, the question is, do you come to a court or do you go to Congress? and say, look, what you've done for pension plans to bar anti-assignment provisions, you need to do for health care plans. And we're back to where we were at the outset. There's six circuits that have said, silence is not a bar, and they can go ahead and do this. And what are you asking? In effect, you're asking us to make policy. I just want to make sure I heard you correctly. Did you say that the pension side prohibits anti-assignment clauses or they prohibit assignment? They prohibit assignment clauses. They prohibit assignment clauses. Excuse me, you're right. Right, so I think that when Congress specifically chose to prohibit assignments and were silent about assignments generally, anti-assignment or assignments, they basically were referring or they allowed the general rule to prevail. The general rule is that assignments are allowed. And this court has already endorsed the idea that assignments benefit patients. Let's back up. What is the provisions for pension plans? What do they say for assignment provisions? If you attempt to assign a pension plan, can you or can't you? You cannot. Okay. That cannot be assessed. Correct. Now, in health care plans, it's silent. Congress was silent about that, yes. So why can't the contract? I mean, that's how we're built in this country. Contracts prevail unless there is a public policy somehow put forward that says that that particular contract cannot be enforced. Right. Well, let's look at what this court did in North Jersey Brain and Spine. That involved the language of an assignment, which insurance companies were trying to get this court to interpret very narrowly. This court rejected that and instead interpreted it liberally in favor of patients because it believed that assignments generally protect patients' interests, specifically access to care. But we've done so in the absence of an anti-assignment clause. How does that really help? It helps because the anti-assignment clause is trying to achieve the same thing through different means. In both cases, the ultimate effect will be that we will be precluding meaningful judicial review and we'll have to just trust insurance companies to properly reimburse claims every single time. The only person in the actual position or the best position to challenge those determinations, their reimbursement determinations, are providers, and they're the real party in interest after all. So if we want to just trust them, then we are put in a situation where the patient will ultimately have to deal with, on the one hand, dealing with a lawsuit of being sued for unpaid bills, and on the other hand, if they want to try to get out of that situation, they'll have to try to sue the insurance companies, a multimillion-dollar insurance company. They can't. They can't, and they don't have an incentive, and it's simply unfair to them. And so it's true. I don't represent patients. I represent providers. And in this circumstance, in this context, their interests align, and this court has recognized that. Again, you're making policy arguments, and Ms. Danielewski made the point that Congress has seen this evolution in the marketplace, and there's no provision for it, even with significant amendments. Why doesn't that answer the question as to Congress's intent, Congress's understanding in reenacting parts of the statute or enacting other statutes that don't address this issue? I think the same could have been said in the case of escape clauses, and yet this court found that the immediate need was to go into the contract and strike them down because they found that they were inimical to the patient's interests, and I think that's exactly what needs to happen here. I think that the public policy is in favor of the position that we are putting forth here today, and this court has the authority to use public policy in its decisions and come into the ERISA contract and say these clauses do not have effect against providers, and providers only. We're not asking for a ban across the board of all anti-assignment clauses. Only where doing so or allowing anti-assignment clauses will have an adverse effect on the person that ERISA is supposed to protect the most, and that's the patients. Thank you very much. Thank you. Thank you to all counsel for being with us today. We'll take the matter under advisement.